Before STATE INDUSTRIAL BOARD, Respondent.

AGATHE DADE, Respondent, *v.* THE NEW YORK CENTRAL RAILROAD COMPANY, Appellant.

Third Department, November 13, 1924.

**Workmen's compensation — interstate commerce — claimant's intestate was shot and killed in night time in yard of defendant railroad, his employer — evidence shows that his duties were to watch buildings and cars in yard — evidence shows that he was killed while protecting car of coal shipped from Pennsylvania and not yet delivered — employee was engaged in interstate commerce.**

The claimant's intestate, who was killed by gunshot while in the railroad yard of his employer and during working hours, was at the time of his death engaged in interstate commerce, since it appears that his body was found about 125 feet from a car loaded with hard coal which had been shipped from Pennsylvania and not yet delivered; that two bags filled with hard coal were found about 20 feet from the car; that intestate had on several occasions protected loaded cars against thieves; that, although it was not shown what his instructions were

as to his duties, he actually in the performance of his work guarded not only the buildings of the railroad but also the cars and other property in the railroad yard; and that the evidence establishes that at the time of his death he was engaged in protecting said carload of coal which was then in interstate commerce.

APPEAL by the defendant, The New York Central Railroad Company, from an award of the State Industrial Board made on the 13th day of July, 1923.

*Whalen, Murphy, McNamee & Creble [Robert E. Whalen* of counsel], for the appellant.

*Carl Sherman, Attorney-General [E. C. Aiken, Deputy Attorney-General,* of counsel], for the respondents.

VAN KIRK, J.:

The employee, Albert Dade, was killed by a gunshot while in the yard of his employer at Frankfort, N. Y., and during his working hours. The one question surviving is whether or not the deceased, at the time he met his death, was engaged in interstate commerce. The answer to this question depends upon whether it was his duty to watch the yard or coal cars therein and whether or not he was, at the time, in the performance of that duty. That he was a factory night watchman, employed to watch a number of buildings, is undisputed. In passing from one of these buildings to another he necessarily passed through his employer's yard where coal cars in transit were often left. His body was found between a west-bound track and a west-bound siding, about 125 or 150 feet from a car loaded with hard coal, which car was still in the custody of the employer and yet to be delivered by it. Two bags filled with this hard coal were found about twenty feet from this car. Hearsay evidence informs us that these bags were first found at the end of the car, between it and another car coupled to it. Whoever filled these bags did not take them away. No one, so far as learned, saw the shooting, but it occurred between eight and eleven o'clock, P. M. Deceased had been that evening in the performance of his work as night watchman and there is no evidence that any other employee or watchman was in the yard or had the duty to watch this coal at this time. Deceased was shot through his left side near the heart and apparently dropped where shot, which was near his natural and usual course when going from one building to another; but there is nothing to indicate that the watching of any building gave occasion for the killing. The deceased was employed by Mr. Barker, who is now dead, and who was known as the superintendent of the foundry and other buildings. No one heard the contract of employment between Barker and the deceased and in consequence no witness could name the duties of the deceased as defined by the

contract of employment.   Not knowing this contract it was neces-
sary, in order to fix his duties, to determine the work the deceased
was accustomed to do.   Mr. O'Rourke, a witness, was the night
foreman and was over the deceased; to him deceased made his
reports.   He says the deceased was the night watchman and his
duties were to watch the company's property, the buildings and all
property that came within the area between the buildings, which
includes the railroad yard.   The deceased made a trip through the
buildings every hour during the night and crossed the yard twice
each trip.   In making his reports to O'Rourke the deceased,
as often as twice a week, told O'Rourke that he had caught coal
thieves in the yard.   To his knowledge, he says, the deceased did
protect the coal in the yard.   Caring for the yard came under
O'Rourke's control only in the case of the watchman.   O'Rourke
was working in the locomotive department under Mr. Barker.   Mr.
Caswell was the station agent at Frankfort.   He did not employ
the deceased and had no supervision over the buildings.   He had
charge of transportation and the yard, including loaded cars therein.
The coal car above mentioned had been left in the yard to be later
delivered to the consignee, which would require a movement of
about 1,000 feet.   He had no control or authority over Dade, but
he did not employ any watchman in the yard.   He testified that
he knew what Mr. Dade's duties were.   They were to watch all the
company's property within his beat.   When the witness was asked
if Dade undertook to protect the coal in the yard the referee refused
to permit him to answer; but he testified that it was Dade's duty
to scare away thieves in the yard; also that there were instructions
in force, which relate to employees generally, directing that an
employee shall guard the company's freight when it comes within
his area.   It is the duty of every employee to protect that property
of the New York Central when it comes in his way.   No printed
rules or instructions were produced.   This evidence shows without
dispute that the deceased was a night watchman, whose duty it
was to watch the buildings and make his report to his foreman,
Mr. O'Rourke; and he did from time to time report to O'Rourke
that he had driven away thieves from the coal cars.   It does not
appear specifically what property he was hired to watch, but it
does appear what property he did watch; and it would be a natural
incident to his duties that he should protect against thieves any
property belonging to, or in the custody of, his employer.   If this
be not so, and if deceased was shot while trying to protect the coal,
then he did not receive his injuries in the course of his employment.
The fair inference is that he was shot by a person engaged in stealing
coal, and that, in passing through the yard, he detected this thief.

It is not a fair inference that the coal thief would be induced to kill under any incentive less than fear of detection.

It seems to us that the finding that "At the time that Albert Dade received the accidental injury that resulted in instant death, he was not engaged in interstate commerce, nor any work so closely identified therewith as to be a part thereof " is without evidence to support it. It is a conclusion and the facts on which this conclusion is based are not found. This car of coal had come from Archbold, Penn., and had not yet reached its destination; it was a part of interstate commerce. If we are right in our conclusion that, at the time he was shot, he had detected a person or persons stealing coal and was attempting to apprehend them or drive them away, he was at the time employed in interstate commerce. (*Industrial Commission v. Davis*, 259 U. S. 182.)

The award should be reversed and the claim dismissed.

All concur.

Award reversed and claim dismissed, with costs against the State Industrial Board.